Case number 23-1114, Latrice Crispell v. FCA US, LLC Argument not to exceed 15 minutes per side. Mr. Washington, you may proceed for the appellant. Members of the Court, my name is George Washington, and I have the privilege of representing Latrice Crispell in this case. And as I said on the forum, I'd like to reserve three minutes for rebuttal. In this case, I think the Court knows Ms. Crispell worked at the Warren Truck Assembly Plant for some 24 years. Nobody claims that she ever did any, her on-the-job performance was always excellent. But she did have a problem, and especially in the last two years, which is the relevant period, that problem was directly related to her FMLA condition. You've seen the report from her psychiatrist. It was a serious condition. She had major depression and mood swings, which caused her to lose the ability of memory and focus and doing daily tasks. That never affected her work performance, but it did occasionally affect her ability to call in. And her supervisors knew that, and as you saw in the reports by Mr. Brennan, a labor relations official, in 2017, they knew she said, look, I didn't call in on time because of this condition, and they overlooked it and gave her an excused day, presumably because of the nature of her job and how well she did it. For whatever reason, they started writing her up in the summer of 2017. This case involves two suspensions, one on January 24th and one on March 24th of 2018. In each case, she called 15 minutes approximately before her shift, rather than 30. And in each case, there's no dispute that tardiness was covered by the FMLA. The only issue was the notice. The last point of this case, and the case I want to focus on, is the discharge. On September 20th, while she was on her way to work, normal day, going down westbound 8 Mile Road, trains doing work for FCA stops in the middle of 8 Mile. Sorry, can I ask a question about the discipline for the other two incidents?  I guess there's some question about whether you're making an interference claim or a retaliation claim. Yeah, I think this court's decision in Render and Millman makes clear that, and in fact, your concurrence makes clear that in certain cases, a retaliation claim is an interference claim. I think the concurrence was saying that the retaliation claim falls under a certain section of the statute, which also happens to be the interference section. But I don't, I think there's still a difference between a retaliation claim and an interference claim in terms of the elements, I take. You would agree with that, right? I agree with that, Judge, but I think what this court said in Wysong and what Rule 1 says is, I use the word retaliate in one place in the complaint, and I certainly regret that. But on the other hand, I also say she was disciplined because of her FLA, the way her FMLA condition impacted her ability to call in. And it seems to me that's an interference claim, and under this court's decision in Render and Millman, it seems to me that the court has held that we're not going to decide it on that basis. We're going to look at the facts, because we litigated this entire thing. We did discovery, we did all of that, and it seems to me that's where we should go. But you want us to look at it as an interference claim. Yes, yes, absolutely, on the two suspensions. I think the discharge is a different matter. That's clearly a retaliation claim. And let me say on that claim, I think the district court, when it granted summary judgment, simply ignored major central disputes of fact. There is no question that Mr. Campbell, the deciding official, knew this employee had filed an EEOC charge and had done all kinds of things, protected activity to claim FMLA benefits, whether those were just or not is another issue, but there's no question she did that in good faith. There's no question that she told him immediately, and her supervisor, I was just stopped by that train. There's no question that the governing policy says, by Ford and the UAW, I'm sorry, Celantis and the UAW says, we will not hold it against people if they were prevented from getting to work or calling in by circumstances that were unpredictable and beyond their control. And I can't think of something more unpredictable and more out of your control than if a 40-ton train stops in the middle and absolutely blocks your way to the plant. And how do you respond to the claim that this tragedy or trag, is that how you pronounce it? Right. Has to be a group? Well, I think it's just not true. The truth is the labor relations representatives, Ms. Dorch and Mr. Kaufman said, oh no, we give tragedy excuses if somebody has a blowout, a flat tire, they have a problem with their badge, anything else. And more than that, your honor, the contract itself is clearly says if an individual has a problem. And I think Mr. Campbell, in addition to simply ignoring the policy and just flatly failing to investigate, all he had to do was call the shipping department and say, did our train block 8 Mile Road? He didn't even make that call, which I think is evidence of animus itself. But I also think he lied, or there's evidence from which a jury could conclude he lied. Because he said, as far as I know, we've never granted a tragedy excuse for that train. Turns out a little bit of gumshoe work, a couple of subpoenas, we find that three weeks before this, they give that extension to seven people, that exception to seven people who were stopped by that train. And the other thing, so it seems to me he just covered that up. But then he said, well, it has to be the masses. That's not what the contract says. But in addition, I would submit that seven people in a major auto plant, one of the biggest plants in Stellantis, is not the masses. And also, I think on this particular ‑‑ I was unclear on that. Was it the same train incident? Yes, absolutely. Absolutely. It was the same train, same location. And from those of us who are from Detroit, I think we all know that location had been stopped by that train, to be perfectly frank. But in any event, I think the fact that there was no investigation, that they gave that excuse to other people, that they didn't give it to her, is just, these are major disputes. And I think a jury has to decide, does that show intent, or is this just our policy? And I don't know how they claim it's their policy, but it seems to me that's a jury question. On the FMLA, can you address the adequacy of her invoking that, in the sense that, did she give enough of an explanation? Yeah. Stellantis relies on a testimony by Mr. Kauflin, who was a Deputy Labor Relations Official. But the interesting thing about that testimony is, first of all, it's disputed. Ms. Crispell says, I didn't say that in her declaration. And second, it's not disputed because Ms. Stebbins, we don't really even know who made the decision to deny these things, because she said, maybe I did, maybe the legal department did, I really don't know. But the one thing she was positive on is, I never talked to Mr. Kauflin about this. So even if you resolve the credibility dispute and say, well, Mr. Kauflin says this, I think the evidence is that that discussion had nothing to do with the decision, because the people who made it in Auburn Heights didn't know about that conversation. But I also think, Your Honor, that notice, I think this Court has had many, many occasions, is almost inherently a fact question, or often a fact question, let's put it that way. And it seems to me, in this case, she said, and this all occurred at the time all of the UAW officials were being indicted, and she said, look, I took, I went to Labor Relations myself. I talked to an official there. They said, bring in something for your doctor. I brought in Dr. Reuben Fair's one-page report which says this person can't focus, can't think about it. She said, this is the reason I was late. I don't know what better explanation you can give. And they can dispute, well, we don't think we got it. I think it was the Acker case in the Fifth Circuit said, you've got to give some indication of what it is. Why is it different than it's been before? What was the, what happened that morning? I mean, there's got to be a little bit more detail than just saying, you know. Well, yeah, but I don't know. Why can't you call in? I mean, that case, it was the same exact requirement, a 30-minute call-in requirement, which doesn't seem unreasonable. I mean, if you know you can't come to work, you know, but okay, fine, it comes up. But the handwritten note doesn't seem like it gives any indication as to what was going on. Well, you know, I think if somebody who was actually making the decision ever talked to her, and Ms. Stebbins didn't, the legal department did, and said what was the problem, she could have said, well, you know, look, I woke up and I was in a complete panic. But that was never done. It was never done. She submitted a statement, and they decided it was inadequate, and they never talked to her about it. And, again, it seems to me that's a fact question. And the rule, the 29 CFR 303, which the district court didn't, there's nothing they didn't consider. This is the unusual circumstances. Yes, it is. Yes, it is. And I think that was done deliberately because I look back at the genesis of that rule. And management said, well, we want our rules, period, and that's it. You know, black and white so we don't have to worry about it. Labor said, well, this is not good enough because if you're dealing with sick people, by definition, they can't call in sometime. And so they came up with this unusual circumstances. And Acker just said, well, it's not good enough. If you called into one line, which the guy did, you can't say I was unable to call in to the other line, which I think makes perfect sense. But where you've got a psychological condition, it does seem to me that's a statement of a question of fact. And I do think all those district court decisions, I know citing district court decisions isn't the best thing in the court of appeals. Let me ask you this. Every time she would have a flare-up, in your mind, that would be an unusual circumstance that would satisfy the RAG? I think they could ask her about it. I absolutely think they could ask her about it and say if this is, you know, tell me what happened. I'm asking you as a matter of law. Pardon? As a matter of law, would that be sufficient? For this particular employee, would every time she had a flare-up and couldn't make the 30-minute call-in window, would that be an unusual circumstance under the RAG? Well, it seems to me if it happens too many times, it's not an unusual circumstance, and then it's not protected by the RAG. But we're talking about six times over the course of a year, and I would just say they had no problem accommodating this for years beforehand, none. I mean, should they be punished for that? I mean, maybe they could have done it and they decided not to and they wait six times, but at some point they say, look, enough is enough. I don't know, you know, it seems odd to hold that against them and to make that an argument against them. Well, it seems to me that it says that it wasn't hurting their operation because they would have done something if it was. And, no, there's not a single statement. Well, again, so they would have been better off just the first time saying no, right, rather than saying, okay, we'll let it go, we'll let it go, we'll let it go, and then all of a sudden, hey, you let those go, you're a bad actor. Well, I would just say, Judge, and I'm way over my time, but I'll just try to answer your question. There's not a single affidavit statement from a deposition of anybody that this hurt production in any way because she didn't even really start work until an hour or hour and a half after she got there because of the nature of her job. And she worked there for many years, and I assure you that if there was one time this had caused some problem, we would have had an affidavit. There's not a one that there was ever a problem. Thank you.  We'll have your rebuttal. Good morning. May it please the Court. My name is Chris McCullough from Ogletree Deacons, and I'm here on behalf of FCA US LLC. Before getting into the legal issues, I wanted to emphasize a couple of factual points. First, under the company's attendance policy, an employee gets six points before their subject determination. In this case, the appellant is only challenging the final three attendance points, which she incurred in 2018. The appellant is not challenging the first three attendance points, which she incurred in 2017. This is critical because it shows appellant knew she needed to comply with the 30-minute call-in rule in 2017, long before her final three occurrences in 2018. Appellant also knew she needed to comply with the call-in rule because each time she recertified her FMLA, she received an approval letter that gave her the call-in instructions and advised her that she needed to comply with the rule. Despite all of this forewarning about how the 30-minute rule was going to be enforced, the appellant never provided documentation from her physician stating that she could not comply with the rule. Sure, after she was suspended for 30 days, she submitted a letter from her doctor that said her concentration would be affected. But if she was unable to comply with the call-in procedure, why not just say that? The second factual point I'd like to make is that the company... I mean, the doctor said that she was going to have flare-ups and it was going to be a problem. I mean, I don't under-render, I think the company is kind of deemed to have that knowledge, right? So, I mean, why couldn't a jury basically infer or conclude, reasonable jurors say, well, you all knew the reason for the calls. I'm talking about January and March. I mean, surely you knew why she was calling. Surely you knew why she couldn't make it. Her condition, the same condition her doctor identified, the condition that would be covered by the FMLA. The company certainly knew that sometimes the appellant would need to be late for work. But it did not know that she needed to be excused from the call-in requirement. That was not part of her certification. Every time she was approved, the letter said you must comply. I'm struggling with this because you don't expect... If the doctor had said to you something more specific about your rules, then I think that you would have said, doctor, you don't get to tell us how to run our business. But here the question is, what is her particular circumstance? The symptoms of her qualified illness. And didn't the doctor address the symptoms of her qualified illness? The doctor did not tell us what happened to prevent her from calling in. He told us a general statement that her concentration will be affected and so forth. Which is a symptom of her qualified illness. Her concentration and focus is a symptom of her illness, certainly. It doesn't talk about... You have that report from the doctor. We have a note from the doctor and we have a certification that says you have to comply with the call-in rule. The other point I'd like to make is that the company tried to give the appellant an opportunity to explain why she wasn't able to call in. The company's labor supervisor asked her to explain what prevented her from calling in. But the appellant would not provide any information. She told him, I have FMLA and her handwritten letters are equally circular. The company really did try to engage with the appellant, but she made it impossible. Is there a dispute of fact as to whether Mr. Coughlin had a discussion with her? I don't believe so. Ms. Crispell didn't testify about that at her deposition. Mr. Coughlin says he had a conversation with her. Perhaps on rebuttal, your opposing counsel can tell us what the record says, because my understanding was that there was a dispute on whether a conversation was had. Perhaps I'm at the wrong time frame. The issue is the company did not get an explanation on what happened on February 24th or March 24th. That has never been provided. We have a general letter that says I have FMLA, but what are the details? In turning to the legal issues, on the FMLA interference claim, this is not a claim that's pled in the complaint. The complaint talks about retaliation over and over. It doesn't mention denial of FMLA. The appellant's complaint is different than the complaint in Wysong, where the plaintiff specifically alleged that the employer demanded. Why isn't it enough that the complaint talks about suspension, being suspended, which is from the January and March, or whatever those were, incidents? You're on notice, right? That looks like an interference claim. It's not a lot of detail, all right? But she's clearly complaining that she invoked the FMLA and that she got suspended for it, and that looks like an interference-ish claim. I mean, yes, the word retaliation is used, but even in Acker, they say, I don't know what the – that is an interference claim, I guess you would agree. But, I mean, how were you prejudiced by the pleading? Where the plaintiff says, I was suspended because I exercised FMLA, that is a retaliation claim, and that is what the complaint says to a reasonable person reading it. But why does it matter? I mean, I'm not saying we throw out pleading rules, but, I mean, these claims are odd, it seems to me. We have these two statutory provisions. We have these delineated tests, interference, retaliation. But the gist of it is, hey, I have a medical condition, and I got disciplined for it, and you can't do that. Why is that not enough, just to kind of go forward from there? Well, I think if we look at the Seeger case, that case says that an interference claim is not allowed where the essence of the claim is retaliation. And that's the precedent in this circuit, and that's what this complaint, the essence of this complaint is, I got suspended because I'm an FMLA user. And it's retaliation, repeatedly, throughout the complaint. The Milben v. Feiger decision, that addresses the standard of proof for an FMLA retaliation claim. Then the court went on to apply the prima facie analysis for FMLA retaliation. Milben is not an FMLA interference case. The Render v. FCA case, this, again, this doesn't excuse the appellant for failing to plead FMLA interference in her complaint. The citation to Render really seems more like it's about airing the company's dirty laundry than it is about providing relevant case law. Can you address the pretext on the retaliation, or on the determination? Sure. On the retaliation, we don't believe that there's pretext or causation. The company has been extremely lenient with the appellant in this case, or was extremely lenient with her for many years, reinstating her twice. Right, right, I understand that. But what about the final incident, right, the train? I mean, were other employees excused because this train had delayed them? She wasn't. It looks like maybe they were treated differently. What's the response to that? The appellant has produced evidence that they believe shows that the company excused a group of employees after they were stuck behind a train. Ms. Chrisbell was by herself. Ms. Chrisbell had been driving this route for 25 years. She knew that a train, there's a train that goes through the roadway. I don't understand why that would be all of a sudden an excuse for a tardy when she's the only person. Why was it an excuse for the seven employees that were excused three weeks before? That's the company's policy when there is a group of people who are affected, and that's the testimony. Where in the MOU is there an indication that it has to be a group? There is not in the MOU. It is the testimony from the labor supervisor who testified that this is the way the company applies their policy, and that is a company decision. As courts have found, they don't sit as super personnel departments. Companies are entitled to run their business. She was the only person stopped to the point of counsel who mentioned, well, what if somebody has a flat tire? The testimony from the labor representative is you must produce documentation. If you get a flat tire, then get it fixed, produce the tow receipt. We went back and got some documentation that showed that the train had actually stopped in front of the crossing. That documentation was through the subpoena process in this case. It was not at the time that the decision was made. And again, she's, you know, this is a train. Nobody said to her, give me proof. I mean, wasn't her superior very willing to let it go? No, I don't believe the superior was willing to let it go, and they didn't let it go. No, I mean the immediate. Yeah, I mean, the plaintiff alleges that she had some conversation with an on-the-floor supervisor that said, let me go check. And he went to check, and it was not approved. Ms. Crispell had many opportunities. March 28, 2018, four days after one of the tardies that's at issue in this case, she had another tardy issue. The company didn't discipline her for that. That would have been her sixth point. Now she's asking for another excused absence in September because of the train. Two reinstatements, many other attendance issues. We don't believe that it's necessary to continue to go down this path of excusing absences where the appellant is not showing improvement. To go to the FMLA interference claim again, even if the court were to find that the appellant's complaint put the company on notice of an FMLA interference claim, the claim still fails because the appellant did not comply with the call-in rule. It's a prima facie requirement to give notice of the intention to use FMLA leave. She did not give notice. To get around this notice requirement, the appellant argues that unusual circumstances prevented her from calling in. This argument's flawed for two reasons. First, the appellant presented no evidence to the district court of unusual circumstances that prevented her from calling in. Again, she simply told the labor supervisor she had FMLA, she should be excused. She said nothing about what happened on January 24th or March 24th, and neither did her doctor. Do you agree that if it was a flare-up from her condition that had been identified, that that would have been an unusual circumstance that would have excused her? No. Her certification was to be sometimes late for work, but to still comply. It doesn't give her an unusual circumstance without telling us what happened. She was not certified to never call in. So that's what I'm saying. If it was an unusual circumstance, but she just didn't give you notice and give you enough detail of it, is that the problem, or that it wasn't anything related to her condition was not an unusual circumstance? Which is, what argument are you making? If she has a flare-up, that's fine. That excuses her from being late. It doesn't excuse her from the call-in requirement unless she provides an explanation or gives us something from her physician. So she can be excused from the 30-minute call-in requirement if it's something due to her condition, but she has to give you more detail than what she gave you? Correct, Your Honor. Okay. Because you had no idea that it could possibly be related to her condition? I'm not sure I understand. You knew that she had this condition. The doctor said she had this condition. She says maybe doesn't give as much detail as maybe you'd like, but it says, hey, it's an FMLA for her. It can only be this one thing because we've known about it for 10 years. Why is that not enough? Well, we certainly knew she had a condition, but this router case tells us that you have to give to show that you're unable to call in on the day in question, and something else that is miraculous in this case, it's incredible, is that the appellant was somehow unable to call in at 4.30 in the morning when she was supposed to, but her condition miraculously resolved itself a few minutes later, and she was able to call in at 4.42 on January 24th and 4.45 on March 24th. I think your red light's on. Thank you. I'd like to respond to some of the points that are made. First of all, insofar as FCA has a problem with the letter that Dr. Rubin sent that didn't deal with the notice question, the FMLA says itself, if the company is unable to call in on the day in question, if the company doesn't like the letter, they think it's ambiguous, they've got to contact the doctor. They didn't do that. And I'm sorry I can't remember the section of the law, but it definitely says that. Second, on the Kauflin conversation, Mr. McCullough is right. Ms. Crisbell did not testify about that in the deposition, but that's because she wasn't asked about it, and she wasn't asked about a whole lot of other things, which is why we've got a long declaration in this case. And I would suggest that the district court simply didn't consider the unusual circumstances rule, which this court has held is exactly what has to govern in this circumstance. The factual development here is really murky. Stebbins says she doesn't know who made the decision, maybe the legal department, maybe I did. She said, I didn't talk to Kauflin. I'm sorry. Crisbell says in her declaration, she says, I don't remember talking to Kauflin, but if I had talked to him, I would have told him that I couldn't call because I was, you know, in a state. And we've just got to, it seems to me this is just a factual circumstance, and in particular where the district court didn't even rule on the question of what unusual circumstances are. Factual circumstance, Greg, does this have to be an interference case for us to look at it? I think, yes, I think it probably, I guess I don't have a strong opinion. It seems to me it would logically be in that kind of case, yes. Is it Winsong, is it both Winsong and actually Seeger that speak about boxing plaintiffs into one theory or another at the complaint stage of an FMLA action based on a narrow reading of the complaint's allegation is overly rigid? Is that our law that governs on that interplay between retaliation and interference, which in the law is pretty unclear. I agree with that. And just a couple more points if I could. A question whether a group was involved or not. Actually the word that the two supervisors used was masses, not a group. But second, I think their credibility is quite subject to dispute because they never said it. They said it never happened. But the third thing is, and it's been ignored, is that there was only one person on September 20th because everybody else on her shift had come in for voluntary overtime at 3.30 in the morning. And that's in the record. And so if that train, and it's not that it crossed the track, it stopped in the track. It's not the normal day when the train might come across. It stopped there. And that is what blocked her. And I don't know what's more unpredictable and more preventing incident than that. Why couldn't she just say to them, I had a flare-up and it puts me in the fog and I couldn't call? I think she did say that. I think her statements essentially, I mean, we're dealing with a, we're not dealing with somebody who's a lawyer, you know. We're dealing with an auto worker who's been there 24 years. And I mean, as I said, I think the question of notice is really pretty foggy here. Did she call when she was stuck behind the train? No, she didn't. And I think there was a ten-minute period. She thought, okay, the minute this moves, I'll be able to get in on time. She did tell them the instant she got in. Had she called, she would have been a late call because it was already more than 30 minutes after. So, I mean, yeah, you can go back and say, well, maybe she should have called with a cell phone. But she thought she could make it and she didn't. Well, your red light is on. I saw that. We thank you both for your briefing and your arguments. And the case will be taken under advisement and an opinion issued in due course.